UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

Case No. 6:09-cr-14-Orl-19KRS

JIMMIE L. THORPE
  a/k/a Jim Thorpe

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT JIMMY L. THORPE'S
MOTION AND MEMORANDUM TO STAY PROCEEDINGS
AND REQUEST FOR A HEARING**

The United States of America, by and through its undersigned counsel, hereby files its response in opposition to defendant Jimmy L. Thorpe's Motion and Memorandum to Stay Proceedings and Request for a Hearing, and in support thereof, states as follows:

1.  Defendant Thorpe's has moved to stay the proceedings in this case until a new Qualified Jury Wheel (QJW) is filled. His motion claims that the "current QJW and Plan for the Qualification and Selection of Grand and Petit Jurors for the United States District Court for the Middle District of Florida, approved by the Eleventh Circuit Panel May 23, 2005 (the Jury Plan), violates that Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. (JSSA), and violates the Sixth Amendment's guarantee that a criminal defendant be tried by a jury that has been selected from a fair cross section of the community." Motion, p. 1. Effectively, in seeking relief, defendant Thorpe has admittedly asked this Court to overrule established Eleventh Circuit precedent and impose a new standard. The United States submits that the instant motion is without merit and should be denied without a hearing.

**MEMORANDUM OF LAW**

I.  **Introduction**

The Middle District of Florida is currently using the 2007 to 2009 jury wheel to select petit jurors.  Defendant claims that there is presently an under-representation of African Americans and Hispanics in the jury wheel.

Challenges to the jury selection process may be based on the fair cross section requirement of the Sixth Amendment, a substantial failure to comply with the provisions of the Jury Selection and Service Act of 1968 (hereinafter "JSSA"), or based on the equal protection component of the Fifth Amendment.  United States v. Grisham, 63 F.3d 1074 (11th Cir. 1995).[1]  The Government will address each of these potential causes of action in turn with respect to both African Americans and Hispanics.

A.  **Sixth Amendment Violation**

"The American concept of the jury trial contemplates a jury drawn from a fair cross section of the community."  Taylor v. Louisiana, 419 U.S. 522, 527 (1975).  The purposes of this fair cross section requirement "are to prevent the improper conviction of a defendant by biased or partial juries, to promote public confidence in the fairness of the criminal justice system, and to ensure that the civic responsibility of jury service is shared by all members of the community."  Willis III v. Kemp, 838 F.2d 1510, 1513-14 (11th Cir. 1988).  "The fair cross section requirement is 'not explicit in the text' of the Sixth Amendment, 'but is derived from the traditional understanding of how an impartial jury is assembled.' "  Grisham, 63 F.3d 1074 at 1078, quoting Holland v. Illinois, 493

---

[1] Defendant Thorpe has raised Sixth Amendment and JSSA challenges, but not a Fifth Amendment challenge.

U.S. 474, 480 (1990). The Supreme Court has held that "petit juries must be drawn from a source fairly representative of the community." Taylor, 419 U.S. 522 at 538. Accordingly, master jury wheels "must not systematically exclude distinctive groups in the community." Duren v. Missouri, 439 U.S. 357, 363-64 (1979).

A criminal defendant has standing to challenge exclusion resulting in a violation of the fair cross section requirement whether or not he is a member of the excluded class. Id. at 359. In order to establish a prima facie violation of the fair cross section requirement, a defendant must show: (1) that the group alleged to have been excluded is a distinctive group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community, and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process. Id. at 364. Once a defendant has made a prima facie showing of an infringement of his constitutional right to a jury drawn from a fair cross section of the community, it is the government that bears the burden of justifying infringement by showing attainment of a fair cross section to be incompatible with a significant state interest. Id. at 368.

1. Distinct or Cognizable Group

The Eleventh Circuit has adopted the Duren test and has provided further guidance on when a Sixth Amendment violation occurs. Addressing Duren's first prong, i.e., to prove a that a group is distinct or cognizable, the Eleventh Circuit stated that:

> "a defendant must show: (1) that the group is defined and limited by some factor (i.e. the group has a definite composition such as by race or sex), (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group, and (3) that there is a community of interest among members of the

> group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

Id.

In the instant case, it is clear that African Americans represent a distinct and cognizable group in the community. United States v. Carmichael, 560 F.3d 1270, 1280 (11th Cir. 2009). Hispanics also represent a distinct and cognizable group in the community. Valle v. Secretary for the Department of Corrections, 478 F.3d 1326, 1327 (11th Cir. 2007); United States v. Aguero, 248 F.Supp. 2d 1150, 1155 (S.D.Fla. 2003). Therefore, defendant Thorpe satisfies Duren's first prong with respect to African Americans and Hispanics.

Although defendant Thorpe can meet Duren's first prong, he cannot meet either of Duren's second or third prongs. Defendant Thorpe relies on the opinion of Dr. Randy Fisher in reaching the conclusion that he has met the second and third prongs and that the present system of jury selection is grievously flawed.

2.  Under-representation

The second prong of the Duren test mandates that defendant Thorpe show that the representation of a cognizable group is not fair and reasonable in relation to the number of such persons in the community. Duren, 439 U.S. at 364. The Eleventh Circuit has held that, in determining whether the representation was fair and reasonable, courts should only be "concerned with the absolute disparity produced by the selection process." Carmichael, 560 F.3d at 1280; United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984).

The Pepe court went on to further explain that "the relevant comparison for fair cross section purposes is the comparison between the distinctive group on the qualified jury wheel and the percentage of the distinctive group among the population eligible for jury service." Id.  The Eleventh Circuit has held that if the absolute disparity between these two percentages is 10% or less, the second element is not satisfied.  Carmichael, 560 F.3d at 1280; Grisham, 62 F.3d at 1079.

Dr. Ira Sheshkin, Associate Professor, Department of Geography and Regional Studies, University of Miami, and Director of the Jewish Demography Project of the Sue and Leonard Miller Center for Contemporary Judaic Studies, explains the difference between absolute and relative disparity as follows:

> "The difference between absolute and relative disparity can best be explained by an example using measurement units other than percentages. Suppose that one buys a car advertised to get 20 MPG. On the basis of the first five fill-ups, you have calculated that the car is getting only 15 MPG. The absolute disparity is 5 MPG; the relative disparity is 25% (5 / 20).
>
> Now suppose that Blacks are 15% of the population, but are only 10% of the QJW. The *absolute disparity* is 5 percentage points; the *relative disparity* is 33% (5 /15). Thus, unlike Dr. Fisher who leaves the absolute disparity without any units, I think it makes it clearer to refer to the units as *percentage points*.

See attached Sheshkin Report (Exhibit 1), pp. 2-3.

Defendant Thorpe candidly admits that the absolute disparity in this case for both groups is less than ten percent. Motion, p. 25.  The figure computed by Dr. Fisher is 5.01 percentage points for Blacks and 5.50 percentage points for Hispanics.[2]  As a

---

[2] In fact, the correct absolute disparity in percentage points is 4.46 for Blacks and 4.77 for Hispanics, as Dr. Fisher did not account for the fact that, in some places, the race and ethnicity of persons on the qualified jury wheel is unknown.  See Sheshkin's report, pp. 4-5.

result, defendant Thorpe cannot meet <u>Duren</u>'s second prong, and this Court need not even proceed to the third prong. For that reason alone, the United States submits that the instant motion should be denied without hearing.

Nonetheless, defendant Thorpe urges this Court to turn topsy-turvy the established case law in this Circuit[3] and, relying on the opinion of Dr. Randy Fisher, use relative disparity instead. Dr. Fisher argues that "relative disparity is a more appropriate measure of under-representation for groups that comprise less than 25% of the population." Motion, p. 24.

Dr. Sheskin's opinion disagrees with Dr. Fisher's conclusion that , and points out the problem with using relative disparity:

> Taken to the extreme, imagine that Group A is 2% of the population, but only 1% of the QJW. No one would really make the argument that Group A is seriously under-represented with a 1 percentage point absolute disparity. But the relative disparity is a misleading 50%.

Sheshkin report, p. 3.

Defendant Thorpe's argument and Dr. Fisher's analysis, therefore, still fails.

Likewise, Dr. Sheshkin disagrees with Dr. Fisher's statement on page 3 of Dr. Fisher's report that relative disparities have the same meaning regardless of the group's proportion of the population.

> For example, if a group is actually 50% of the population, but is 25% of the QJW, the relative disparity is 50% (25 / 50). This is a real difference unlike the 1 percentage point disparity in the previous paragraph.

---

[3] Defendant Thorpe suggests that the cases setting forth this well-established case law are wrongly decided and urges this Court to not follow the law. However, as the Eleventh Circuit stated in <u>Grisham</u>: "To the extent that [the defendant] is requesting this panel to overrule the 10 percent absolute disparity requirement, we are without power to do so. 63 F.3d at 1079, n.4.

As such, defendant Thorpe could not satisfy the second <u>Duren</u> prong even under this assumption.

Dr. Fisher discusses the fact that the Black and Hispanic populations are growing faster than the non-Hispanic populations. Dr. Fisher argues that due to this population increase, the length of time between when persons are selected for the Master Jury Wheel and become part of the Qualified Jury Wheel contributes a further disparity to the under-representation of Blacks and Hispanics and over-representation of non-Hispanic whites. This population, however, is not evidence of any systematic exclusion or discrimination.

> The contention here is that the length of time between when persons are selected for the MJW and become part of the QJW contributes a further (unknown) disparity to the under-representation of Blacks and Hispanics and over-representation of non-Hispanic whites because the Black and Hispanic populations are growing faster than the non-Hispanic white population. This is true. However, it is unlikely that the year-to-year changes are all that significant. Also, a person must be in residence in the area for at least one year to qualify for a jury, ameliorating this problem to some extent.

Sheshkin report, p. 7.

### 3. <u>Systematic Exclusion</u>

Moreover, even if defendant Thorpe could somehow satisfy the second <u>Duren</u> prong, he cannot satisfy the third prong of the <u>Duren</u> test because there is no proof of the systematic exclusion of African Americans in the jury process. Prong III of the <u>Duren</u> test requires defendant Thorpe to show that any under-representation is due to the systematic exclusion of a cognizable group in the jury selection process. <u>Duren</u>, 439 U.S. 357 at 364. The Jury Plan adopted by the Middle District of Florida encompasses no such exclusionary action.

The Jury Plan for the Middle District of Florida mandates that voter registration lists be used for as the primary source for filling the divisional master jury wheels. The use of voter registration lists does not systematically exclude African Americans and has been repeatedly upheld by the courts. See, e.g., Duren, 439 U.S. 357 at 364; Grisham, 63 F.3d 1074 at 1077-82. Courts have upheld the use of voter registration lists even if an identifiable group votes in a proportion lower than the rest of the population. United States v. Arlt, 567 F.2d 1295, 1297 (5th Cir. 1978).

In a hearing before this Court on July 10, 2009, this Court set forth the entire manner in which jury selection is done in this District. It is clear from this Court's recitation that there is no systematic exclusion of Blacks and Hispanics in the jury selection process. Defendant Thorpe, therefore, has not met Duren's third prong.

Nonetheless, defendant Thorpe argues that a systematic exclusion exists because a large discrepancy has existed over a significant period of time. Rather than using an absolute disparity analysis, he uses the relative disparity to try to show this large discrepancy. Since relative disparity is not the legal standard by which the Eleventh Circuit measures the discrepancy, and because it also overstates the discrepancy, defendant Thorpe has not met Duren's third prong.

In sum, defendant Thorpe is unable to meet Duren's second and third prongs and, therefore, is not able to successfully sustain a Sixth Amendment challenge to the jury selection process.

B.  Juror Qualification Form

Defendant Thorpe argues that "the Juror Qualification Questionnaire used in the Middle District of Florida fails to comply with 28 U.S.C. § 1865(b)(2) and (3), in that it

8

over-excludes persons on the basis of English language ability." Motion, p. 26. In fact, there is no violation of the statute. The portion of Title 28, United States Code, Section 1865(b) that is relevant for purposes of this motion provides that a person who is otherwise qualified to serve as a juror can be disqualified if the person:

> (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
>
> (3) is unable to speak the English language; ...

Id.

Defendant Thorpe suggests that the present jury questionnaire should not include the requirement to speak English, and only require a juror to read, write and understand the English language well enough to fill out the jury questionnaire. Such a suggestion totally ignores subsection 3, which allows a judge to disqualify a juror who cannot speak English. Placing the word 'speak" in the question is totally consistent with the statute.

Defendant Thorpe also suggests that because a voter must be a United States citizen, and a citizen must have "an understanding of the English language, including an ability to read, write and speak words in ordinary usage in the English language ..." 8 U.S.C. § 1423(a)(1), the ability to pass a naturalization test means that the person can read and write English sufficient to be a juror. He goes on to state that Question 4 on the JQQ, "Do you read, write, speak, and understand the English language?" sets a higher standard than required by the current statute.

> But, in the citizenship process, another party (an ICE officer) is making a decision on criteria other than that required to be a juror. On the JQQ, the individual citizen is assessing his/her own ability to follow what may be a complex trial and his/her own ability to express an opinion in the jury room. This self-assessment

> may be a superior judgement to that of an ICE officer, who is probably not thinking about jury duty in his/her assessment for citizenship. In addition, the qualifying exams to become a citizen are given in languages other than English under limited circumstances, meaning that many become citizens without satisfactory English-language skills. In fact, the level of English ability required by ICE is much less than necessary to facilitate participation in a jury and to provide a defendant with jurors who can properly adjudicate a case, Question 4 of the JQQ as drafted is clearly necessary.

Sheshkin report, p. 10.

Additionally, attached as Exhibits 2 and 3 are the reading and writing vocabulary requirements for the test; at best, they can be categorized as basic. As long as a person can read and write those words, they can become a citizen. It is clear that if that is all the person can read and write in English, that would be insufficient for a person to sit as a juror. The defendant has a right to have jurors who can comprehend the proceedings; if all they can read and write are the words in Exhibits 2 and 3, they should not be jurors and having them as jurors might well jeopardize a defendant's rights.

There are also other problems with not including the word "speak" in question 4 of the JQQ. For example,

> The ICE requirement for naturalization that a person must read, write and speak words in ordinary usage in the English language is relaxed for persons of a certain age, of certain lengths of residence, and of certain mental restrictions.

Sheshkin report, p. 10. This means that someone who cannot read, write, speak or understand English could still be given a questionnaire for jury selection. This leads to the next problem:

> The JQQ is a mail questionnaire. In any mail questionnaire, there is no guarantee that the person to whom the questionnaire was sent is actually the person who has completed the questionnaire. The JQQ may have been addressed to person X, who, in order to complete the questionnaire, solicits translation help from person Y. Thus, simply assuming, because someone has returned the questionnaire that they read, write, and the understand the English language with

a degree of proficiency sufficient to fill out satisfactorily the juror qualification questionnaire is a mistake.

Sheshkin report, p. 10.

Finally, assuming <u>arguendo</u> that the addition of the word "speak" could be considered a deviation from the statute, it is nothing more than a technical deviation. Mere technical deviations from the Act do not render it invalid, even if a number of technical deviations exist. <u>Carmichael</u>, 560 F.3d at 1277. In this case, if there is a technical deviation, it is not a substantial violation of the statute.

C.   <u>Jury Selection Statutes Violation</u>

Defendant Thorpe has also claimed that the alleged under-representation of African Americans and Hispanics violates the JSSA. The Jury Selection and Service Act, codified at 28 U.S.C. §1861, et. seq., provides that "all litigants in federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." <u>Carmichael</u>, 560 F.3d at 1277. The JSSA provides remedies only for a substantial failure to comply with its requirements. <u>Id.</u>; 28 U.S.C. §1867(d). "A JSSA violation is substantial only when it frustrates one of the three principles underlying the Act." <u>Carmichael</u>, 560 F.3d at 1277. These principles are: "(1) random selection of juror names, (2) from a fair cross section of the community, and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions." <u>Id</u>.

As part of his JSSA violation claim, defendant Thorpe suggests that there is a need to use alternative sources for the Master Jury Wheel. According to Dr. Sheshkin, however, such alternative sources are not necessary.

> The defendant claims that voter registration roles do not accurately represent the community. The data do show that non-Hispanic whites are over-represented and non-Hispanic Blacks are under-represented among registered voters, but not in any substantial way. I would argue, as shown in the first three rows of Table I below that such is not a major source of under-representation. 10.83% of registered voters are Black, compared to 11.33% in the American Community Survey (ACS), and 12.34% of all persons with driver's licenses or ID cards. The similar percentages for Hispanics are 12.77%, 13.96%, and 13.98%. These rather small differences do NOT suggest the need to use alternative sources for the MJW.

Sheshkin report, p. 6.

The Eleventh Circuit has interpreted the randomness requirement to mean that there is "no room for impermissible discrimination against individuals or groups." Id. The Eleventh Circuit has also stated that the test for a fair cross section of the community is identical to the Sixth Amendment Duren test. Id.; United States v. Rodriguez, 776 F.2d 1509, 1510 (11th Cir. 1985). Even though African Americans and Hispanics are cognizable groups, the Jury Plan for the Middle District of Florida does not impermissibly discriminate against them. Rather, as stated by this Court at the July 19, 2009 hearing, jurors are selected at random. This lack of discrimination coupled with defendant Thorpe's inability to satisfy Duren's second and third prong with respect to African Americans and Hispanics forecloses a potential claim of a JSSA violation.

D.    Conclusion

WHEREFORE, for all of the aforementioned reasons, the United States respectfully requests that this Honorable Court deny defendant Thorpe's Motion to Stay without a hearing.

                Respectfully submitted,

                A. BRIAN ALBRITTON
                United States Attorney

By:   *s/ I. Randall Gold*
        Assistant United States Attorney
        Deputy Chief, Orlando Division
        Florida Bar Number 0268062
        501 West Church Street, Suite 300
        Orlando, Florida  32805
        Telephone:  (407) 648-7500
        Facsimile:  (407) 648-7643
        E-mail:  randy.gold@usdoj.gov

U.S. v. JIMMIE L. THORPE    Case No. 6:09-cr-14-Orl-19KRS

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Mark L. Horwitz, Esquire

                                     *s/ I. Randall Gold*
                                     Assistant United States Attorney
                                     Deputy Chief, Orlando Division
                                     Florida Bar Number 0268062
                                     501 West Church Street, Suite 300
                                     Orlando, Florida  32805
                                     Telephone:   (407) 648-7500
                                     Facsimile:    (407) 648-7643
                                     E-mail:         randy.gold@usdoj.gov